UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 20-22812-CV-SCOLA/O'SULIVAN

MAIRA MARTINEZ,
        plaintiff,

v.

KILOLO KIJAKAZI,
Acting Commissioner for Social Security,
                Defendant.
_____/

## REPORT AND RECOMENDATION

THIS MATTER is before the Court on the plaintiff's Amended Motion for Summary Judgment (DE # 27, 3/2/2021) and the Defendant's Motion for Summary Judgment (DE # 28, 3/31/2021). The plaintiff seeks reversal and remand of the decision of the Commissioner of Social Security, which found that the plaintiff was not disabled. The complaint was filed pursuant to the Social Security Act, 42 U.S.C. § 405(g), and is properly before the Court for judicial review of a final decision of the Commissioner of the Social Security Administration ("SSA"). This matter was referred to the undersigned by the Clerk's Notice of Judge Assignment (DE # 2, 7/8/20). Having carefully considered the filings and applicable law, the undersigned recommends that the plaintiff's Amended Motion for Summary Judgment (DE # 27, 3/2/2021) be **GRANTED** and the Defendant's Motion for Summary Judgment (DE # 28, 3/31/2021) be **DENIED** in accordance with the following Report and Recommendation.

## PROCEDURAL HISTORY[1]

The plaintiff, Maira Martinez, filed a claim for disability insurance benefits ("DIB") on January 3, 2018, alleging disability beginning on August 4, 2017. (Tr. 65). The plaintiff's claim was denied initially by the State Disability Determination Services agency ("DDS") on March 22, 2018, (Tr. 73) and upon reconsideration on May 2, 2018. (Tr. 84). The plaintiff appeared and testified at a hearing before an administrative law judge ("ALJ") on September 19, 2019. (Tr. 31-63). On November 1, 2019, the ALJ found the plaintiff not disabled from August 4, 2017, through the date of decision. (Tr. 24-25). On May 6, 2020, the plaintiff's request for review was denied by the Appeals Council. (Tr. 1-9).

## FACTS

### I.   Plaintiff's Background

The plaintiff was 53 years old when she filed her application for disability insurance benefits (DIB) on August 4, 2017. (Tr. 64). The plaintiff was 56 years old on November 1, 2019, the date of the ALJ's decision. (*Id*.). The plaintiff alleged a disability onset date of August 4, 2017, due to diabetes, diabetic neuropathy, high blood pressure, panic attacks, anxiety, acid reflux, high cholesterol, fibromyalgia, and back problems. (Tr. 65, 152-55). The plaintiff completed two (2) years of college and previously worked in accounts payable/receivable for a car dealership. (Tr. 179). As indicated in an admission note from Baptist Hospital dated January 13, 2016, the plaintiff had cervical spine surgery in 2003. (Tr. 847).

---

[1] All references to "Tr." Refer to the transcript of the Social Security Administration record filed December 10, 2020. (*See* The Social Security Transcript (DE # 17, 12/20/20)).

II.    **Summary of Medical Evidence**

A.    **Physical Impairments**

1.    **Background**

The plaintiff initially underwent a lumbar spine MRI on January 14, 2016, a year and seven months before her alleged disability onset date of August 4, 2017. (Tr. 854). The MRI indicated an extruded disk resulting in compression of nerve roots and severe foraminal stenosis at multiple levels. (Tr. 854, 904-05).

2.    **Sylvia Vives-Montanto, P.A.**

On August 2, 2017, two days before the plaintiff's alleged disability onset date, the plaintiff was seen by Sylvia Vives-Montanto, a physician assistant (PA). (Tr. 594). The plaintiff's visit was due to pain in the back, shoulders, and neck area, shooting pains in both legs, and burning in the feet. (*Id.*). PA Vives-Montanto noted that the plaintiff was a long-time diabetic and had a history of spine surgery. (*Id.*). Following the assessment, sensory defects of the bilateral distal legs and feet were noted. (Tr. 596). PA Vives-Montanto prescribed the plaintiff multiple medications, ordered diagnostic testing for the plaintiff, and referred the plaintiff to a rheumatologist. (Tr. 596-97).

3.    **Jose Joy Arriaga, M.D., and German Colon, M.D., at Baptist Hospital**

On August 6, 2017, the plaintiff was admitted to Baptist Hospital due to severe back pain. (Tr. 326). German Colon, M.D., performed a CT of the plaintiff's lumbar spine which was positive for multilevel discogenic and spondylitic changes. (*Id.*). On August 7, 2017, a lumbar spine X-ray revealed no evidence of compression deformity. (Tr. 559). The X-ray did indicate multilevel osteophytosis and mild narrowing of disk spaces at L4-S1. (*Id.*). On August 8, 2017, the plaintiff underwent a lumbar spine MRI with contrast. (Tr. 312). The MRI indicated an L5-

S1 small left herniation and ventral defect associated with mild local mass effect suspicious for recurrent disc herniation and possible free fragment. (*Id.*). On August 10, 2017, the plaintiff underwent an L5-S1 epidural steroid injection. (Tr. 315). The plaintiff had no intractable back pain relief following the steroid injection, and surgical intervention was discussed. (*Id.*). Neurosurgeon Jose Joy Arriaga, M.D., recommended a revision of the plaintiff's lumbar laminectomy with fusion but noted this procedure would not 100% guarantee relief. (Tr. 312-16). On August 23, 2017, Dr. Arriaga performed a revision of the plaintiff's lumbar laminectomy, facetectomy, and lumbar fusion. (Tr. 257). Rehabilitation was recommended but the plaintiff declined and wanted home health care. (Tr. 373). Home health care was arranged for a rolling walker, nurse evaluation, aid, and physical therapy. (*Id.*). The plaintiff was discharged on August 29, 2017. (*Id.*).

On September 2, 2017, the plaintiff was again admitted to the hospital due to back pain. (Tr. 399). The plaintiff underwent a lumbar MRI that revealed postoperative changes. (Tr. 443-45) The plaintiff's pain symptoms were treated and controlled with intravenous and oral narcotics. (*Id.*). On the day of the discharge, the plaintiff was seen by a physical therapist, who found the plaintiff ambulated well. (Tr. 399). The plaintiff underwent a pelvic MRI, CT, and ultrasound. (Tr. 440-41, 446). The results of these tests were generally normal and showed no changes from previous examinations. (Tr. 444). The plaintiff was discharged on September 7, 2017, with prescriptions for pain and muscle spasms. (Tr. 410-16, 431). An October 27, 2017, lumbar spine X-ray ordered by Dr. Arriaga revealed successful posterior fusion at L4-S1 with no evidence of hardware malfunction or malalignment. (Tr. 392).

### 4. Juan Mantilla, M.D.

The plaintiff visited Juan Mantilla, M.D., an internal medicine physician, on September 21, 2017. (Tr. 592). During this visit, Dr. Mantilla observed that the plaintiff had no sensory deficits, her gait was normal, and her deep tendon reflexes were symmetrical. (Tr. 593). During an April 20, 2018, visit with Dr. Mantilla, the plaintiff disclosed she was not taking medications due to the loss of health insurance. (Tr. 1114).

### 5. Rafael Rivas Chacon, M.D.

On April 9, 2018, the plaintiff visited rheumatologist Rafael Rivas Chacon, M.D., due to severe pain in her muscles and joints. (Tr. 1034, 1036). With respect to trigger points, Dr. Rivas Chacon noted 16 of 18 total tender points. (Tr. 1037). Other findings, including eyes, ears, nasopharynx, neck exam, respiratory, cardiovascular, neurological, psychiatric, abdomen, skin, and joints were normal. (*Id.*). Dr. Rivas Chacon assessed the plaintiff with myalgia, indicated the plaintiff likely had fibromyalgia, and prescribed medications accordingly. (*Id.*). Dr. Rivas Chacon noted that the plaintiff's "treatment and management is limited because of lack of insurance." (*Id.*).

### 6. Shakra Junejo, M.D.

On May 2, 2018, for benefits reconsideration, the plaintiff met with consultative state agency reviewing physician, Shakra Junejo, M.D. (Tr. 75-84). Dr. Junejo reviewed: (1) the September 2-7, 2017, hospital records; (2) the September 27, 2017, treatment record; (3) the October 27, 2017, lumbar spine X-ray impression that indicated posterior fusion L4-S1; (4) rheumatology medical evidence of record up until April 9, 2018; and (5) the March 13, 2018, psychological examination report. (Tr. 68, 79, 80). Dr. Junejo's opinion did not include the August 2017 examinations, imaging, and surgical treatment, or any evidence relating to the

5

plaintiff's right upper extremity. (*See* Tr. 75-84). In considering some, but not all, relevant objective medical evidence[2], Dr. Junejo opined that the plaintiff's hyperlipidemia, diabetes mellitus, and dysfunction of her major joints were severe impairments. (Tr. 79, 84). Dr. Junejo also found that the plaintiff's September 2017 "MRI was unremarkable." (Tr. 68). Dr. Junejo opined that the plaintiff could complete light exertional work, and only occasionally perform postural activities. (Tr. 82-83). Dr. Junejo did not find any manipulative or environmental limitations for the plaintiff. (*Id.*). Dr. Junejo opined that the plaintiff could perform past relevant work as an accounting clerk. (Tr. 84).

### 7.  August 2018 Emergency Room Visits at Baptist Hospital

On August 6, 2018, the plaintiff was treated in the emergency room at Baptist Hospital due to chest pain that began four days prior. (Tr. 1122-23). The plaintiff's heart and lungs were examined and were within normal limits. (*Id.*). During an examination of her back, the plaintiff showed tenderness but had a normal range of motion. (*Id.*). The plaintiff's neck examination was unremarkable. (*Id.*). The plaintiff had full range of motion, strength, and sensation in her extremities. (*Id.*). The plaintiff was admitted to the hospital for further examinations of her chest pains, but results were consistently within normal limits. (Tr. 1125, 1135, 1137, 1145).

The plaintiff went to the hospital again on September 12, 2018, due to chest pains and right arm pain with numbness in the fingers. (Tr. 1152). Examination of the plaintiff's neck, heart, and lungs was within normal limits. (Tr. 1154). The plaintiff had normal motor function other than decreased sensation in the right arm and hand. (*Id.*). The plaintiff also had normal range of motion and normal strength in her extremities. (*Id.*). The plaintiff's blood labs revealed significantly elevated blood glucose levels of 188. (Tr. 1160). On September 13, 2018, the

---

[2] As outlined above.

plaintiff was admitted to Baptist Hospital and Larry Kessler, M.D. performed a cervical spine MRI without contrast on the plaintiff. (Tr. 1176-77).

On the same date, September 13, 2018, the plaintiff received an inpatient occupational therapy evaluation by occupational therapist Janice Arcay due to chest pain radiating to the right arm and back. (Tr. 1180). The plaintiff also had an elevated blood glucose level of 188. (*Id*.). Results of the examinations revealed that the left upper and lower extremity active range, left upper and lower extremity passive range, right upper and lower extremity active range, and right upper and lower extremity passive range were all within functional limits. (Tr. 1191). The plaintiff's right upper extremity strength of her fingers, forearm, wrist, and elbow were all graded 3+/5 and the shoulder was graded 4/5. (Tr. 1192). The plaintiff's right upper extremity sensation to light touch was impaired, the rest of her measured sensations were intact. (*Id*.).

A September 14, 2018, examination showed the plaintiff's right upper extremity strength was 4/5 and her right upper extremity active range of motion was impaired. (Tr. 1184). A September 14, 2018, discharge note indicated that the plaintiff was informed of the MRI results and the plaintiff wanted to have surgery during that hospitalization. (Tr. 1172). The plaintiff was further informed that it was not an emergency and surgery would not be done immediately. (*Id*.). Thereafter, the plaintiff became uncooperative. (*Id*.). The plaintiff was advised to address her pain through outpatient pain management. (*Id*.). The plaintiff refused a prescription for Crestor and was discharged. (*Id.*).

### 8.  Patrick Owens, M.D.

The plaintiff was examined by orthopedist and hand surgeon Patrick Owens, M.D., on August 27, 2019. (Tr. 1231). The plaintiff visited Jackson Health System, where she saw Dr. Owens due to longstanding numbness and tingling of the right hand. (*Id*.). The plaintiff indicated

that her symptoms progressively worsened over the four years prior and were unrelieved by using a splint or taking Tylenol. (*Id.*). Dr. Owens noted a decreased sensation to light touch on the volar portion of the hand and digits; mild thenar muscle wasting on the right hand compared to the left, and 4/5 strength in right wrist flexion, extension grip, hand intrinsic, and thumb movement. (Tr. 1232). The plaintiff reported previously that she had similar symptoms in her left hand where she underwent carpal tunnel release surgery and reported 80-85% improvement. (Tr. 1231). Dr. Owens concluded that the plaintiff's numbness and tingling in her right hand was "consistent with carpal tunnel syndrome." (Tr. 1233). Dr. Owens also noted that the plaintiff had degenerative disc disease which may have contributed to her symptoms. (*Id.*). Dr. Owens further noted that surgical release of the plaintiff's carpal tunnel would be "the only way to determine the cause of her symptoms." (*Id.*). The plaintiff was interested at the time "in proceeding with carpal tunnel release even though her symptoms may be coming from her cervical spine." (*Id.*). On August 27, 2019, the plaintiff underwent a carpal tunnel release endoscopic. (Tr. 1238).

During a follow-up appointment with Dr. Owens on September 13, 2019, the plaintiff complained of "all back pain." (Tr. 1234). The plaintiff also reported persistent numbness in fingers after surgery and recurrent panic attacks. (*Id.*). Dr. Owens referred the plaintiff to physical therapy, and orthopedics for back pain, recommended that the plaintiff follow up with psychiatry for generalized anxiety disorder, adjusted the plaintiff's medication for diabetes, and ordered a full cervical spine MRI. (Tr. 1235-37). On September 20, 2019, the plaintiff underwent MRIs of the cervical, thoracic, and lumbar spine. (Tr. 1227-30). The cervical spine MRI showed positive for a mild disc bulge, mild bilateral canal stenosis, and mild flattening of the right ventral cord "which may indicate chronic cord impingement." (Tr. 1227). The MRI of the thoracic spine showed a small, herniated disc protrusion, but no central canal/foraminal stenosis.

(Tr. 1228). The MRI of the plaintiff's lumbar spine revealed severe left neural foraminal stenosis, a large disc bulge, moderate canal stenosis, a mild disc bulge, and a probable impingement of nerve root. (Tr. 1229-30).

### 9. Seth Dodds, M.D.

On September 9, 2019, the plaintiff met with Seth Dodds, M.D., an orthopedist specializing in hand surgery.[3] (Tr. 1219). Dr. Dodds completed a medical statement regarding the plaintiff's hand and wrist problems for Social Security Disability claims. (*Id.*). Dr. Dodds' statement indicated the plaintiff had a history of carpal tunnel syndrome in both hands and cubital tunnel syndrome in the right hand. (*Id.*). The plaintiff's diagnosis on September 9, 2019, was carpal tunnel syndrome in both hands and active cubital tunnel syndrome in the right hand. (*Id.*). In the statement, Dr. Dodds opined that the plaintiff had mild to moderate pain. (*Id.*). Dr. Dodds also opined that the plaintiff's right hand fine manipulation was frequently limited, and the rest of the plaintiff's hand manipulation abilities were occasionally limited in both hands. (*Id.*).

### B. Mental Impairments

### 1. Anele Diaz, Psy.D.

On March 13, 2018, the plaintiff was examined by psychologist, Anele Diaz, Psy.D. (Tr. 1027-30). The plaintiff was referred for a general clinical evaluation with mental status by the Office of Disability Determinations to determine the plaintiff's eligibility for benefits due to a psychological condition. (Tr. 1028). During the assessment, the plaintiff was anxious but was able to engage and cooperate with the examiner. (Tr. 1029). The plaintiff's speech was clear, and she was fluent in English. (*Id.*). The plaintiff's vocabulary use, verbal reasoning skills and fund

---

[3] According to the plaintiff's motion for summary judgment Dr. Dodds' records are not entirely included in the administrative record. (*See* The Plaintiff's Motion for Summary Judgment (DE # 25, p. 6, FN6)).

of knowledge suggested low average intellectual functioning. (*Id.*). The plaintiff's hearing and eye contact were adequate, and her speech was slow. (*Id.*). The plaintiff's range of emotions was full, her affect was congruent, and her mood was dysphoric and anxious. (*Id.*). The plaintiff's thought process was logical and organized, and her thinking was coherent. (*Id.*). The plaintiff was oriented to all spheres, but her memory was impaired and was only able to recall one of the three words learned. (Tr. 1030). Moreover, the plaintiff was able to spell a word forward, but it was difficult for her to spell the word backwards, and she was unable to complete a serial 7s task. (*Id.*). Dr. Diaz diagnosed the plaintiff with major depressive disorder, single episode moderate and panic disorder with a guarded prognosis and referred the plaintiff for psychiatric evaluation. (*Id.*).

### 2.  Moises Riveron, M.D.

On June 26, 2019, psychiatrist Moises Riveron, M.D., completed a medical statement concerning depression for a Social Security disability claim, indicating the plaintiff's first visit was on March 18, 2019, and her most recent visit was on June 24, 2019. (Tr. 1222-24). In the medical statement, Dr. Riveron noted the plaintiff's depressive symptoms as anhedonia or pervasive loss of interest in almost all activities and sleep disturbance. (Tr. 1222). Dr. Riveron noted moderate general limitations caused by depression in restrictions of activities of daily living (ADL) and difficulty in maintaining social functioning. (*Id.*). Dr. Riveron further noted deficiencies of concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner (in work settings or elsewhere). (*Id.*). Dr. Riveron also noted that the repeated episodes of deterioration or decompensation in work or work-related settings would cause the plaintiff to withdraw from the situation or experience. (*Id.*). Dr. Riveron indicated that exacerbation of signs and symptoms (which may include deterioration of adaptive functioning)

were present. (*Id.*). Dr. Riveron further opined that the plaintiff had moderate limitations resulting from psychological factors. (*Id.*).

Specifically, Dr. Riveron indicated that the plaintiff had moderate limitations in: (1) the ability to remember locations and work-like procedures; (2) the ability to understand and remember short and simples instructions; (3) the ability to carry out detailed instructions; (4) the ability to maintain attention and concentration for extended periods; (5) the ability to sustain an ordinary routine without special supervision; (6) the ability to work in coordination with and proximity to others without being distracted by them; (7) the ability to make simple work-related decisions; (8) the ability to interact appropriately with the general public; (9) the ability to accept instructions and respond appropriately to criticism from supervisions; (10) the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; (11) the ability to respond appropriately to changes in the work setting; (12) the ability to travel in unfamiliar places or use public transportation; and (13) the ability to set realistic goals or make plans independently of others. (Tr. 1222-24).

Dr. Riveron further indicated that the plaintiff had marked limitations in: (1) the ability to understand and remember detailed instructions; (2) the ability to perform activities without a schedule, maintain regular attendance, and be punctual within customary tolerances; and (3) the ability to complete a normal workday and workweek without interruption from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (*Id.*). Additionally, Dr. Riveron opined that the plaintiff was not significantly impaired in: (1) the ability to carry out very short and simple instructions; (2) the ability to ask simple questions or request assistance; (3) the ability to maintain socially appropriate behavior

and adhere to basic standards of neatness and cleanliness; and (4) the ability to be aware of normal hazards and take appropriate precautions. (*Id.*).

### 3. Community Health of South Florida, Saurabh Varna, D.O. and Christa Desrosiers, LCSW

On July 11, 2019, the plaintiff saw Dr. Saurabh Varna at Community Health of South Florida. (Tr. 1205). The plaintiff reported depression, anxiety, insomnia, shortness of breath at times, and a feeling "of panic." (*Id.*). The plaintiff also reported continued sadness, anhedonia, low energy, low concentration, and poor sleep. (*Id.*). The plaintiff's mental status examination demonstrated a cooperative attitude, coherent speech, and fair insight. (*Id.*). The plaintiff was diagnosed with major depressive disorder, single episode, severe without psychotic features, and was to begin a new medication and continue previously prescribed medications. (Tr. 1206).

On February 28, 2019, the plaintiff obtained a psychiatric evaluation at Community Health of South Florida with Licensed Clinical Social Worker (LCSW) Christa Desrosiers and was diagnosed with major depressive disorder. (Tr. 1196). On May 15, 2019, the plaintiff was referred to Desrosiers for outpatient mental health individual therapy. (*Id.*). The plaintiff was seen by Desrosiers on July 15, 2019, and was described as unkempt, restless, overwhelmed, and pessimistic. (Tr. 1201-02). Notes dated July 22, 2019, indicate that the plaintiff reported she was in pain daily, her medications were not helping, and that she had difficulties paying for her medication to stay in compliance. (Tr. 1204). Treatment notes by Desrosiers dated August 1, 2019, indicate that the plaintiff reported she was happy that her doctor decided to operate on her hand which caused her great pain. (Tr. 1197, 1199).  During the session, the plaintiff started to have a panic attack and it was noted that the plaintiff had panic attacks often. (Tr. 1199). The notes further indicate that the plaintiff would use Community Health of South Florida funds to obtain medications due to a lack of the financial means to do so. (*Id.*).

In a letter dated August 26, 2019, to the Social Security Administration, Desrosiers described the plaintiff's treatment history, diagnoses, and recommendations. (Tr. 1196). Desrosiers noted that it was recommended that the plaintiff have weekly individual sessions, but the plaintiff could only attend biweekly sessions due to financial difficulties. (*Id.*). Desrosiers noted that the plaintiff experienced depressive symptoms and panic attacks. (*Id.*). Desrosiers further noted that the plaintiff had "made minimal progress on her goals and objectives due to severe depression and medical issues." (*Id.*). Moreover, Desrosiers noted that the plaintiff reported body pain, but financial difficulties prevented the plaintiff from getting the help she needed. (*Id.*). Desrosiers recommended that the plaintiff not return to work due to her severe depression and medical issues. (*Id.*).

### 4.  Hearing Testimony

### A. The Plaintiff's Testimony

A hearing was held before the ALJ on September 19, 2019. (Tr. 34). The plaintiff was represented by counsel and testified at the hearing. (*Id.*). At the time of the hearing, the plaintiff was 55 years old. (Tr. 38). The plaintiff testified that she was last able to work as an accounting clerk before her back surgery in 2016 or 2017. (Tr. 39). The plaintiff could not recall exactly when and blamed her forgetful memory. (*Id.*). The plaintiff testified she experienced ongoing pain throughout her body, including muscle and joint pain, especially in her back. (*Id.*). The plaintiff also indicated she had panic attacks. (*Id.*). The plaintiff noted that her muscle and joint pain was primarily caused by fibromyalgia. (Tr. 40). The plaintiff indicated that this was determined by "the specialist" doing "pressure points . . . at certain points of my body," but the plaintiff could not recall the specialist's name. (*Id.*). The plaintiff indicated she was unable to sit, stand, or walk for long periods of time due to her back pain. (*Id.*). The plaintiff also testified that

she recently had hand surgery and her "last two fingers" were numb. (*Id*.). The plaintiff noted that this may require surgery due to a "bad nerve" coming from her elbow. (*Id*.). The plaintiff also indicated she was right hand dominate. (Tr. 41).

The plaintiff testified that while on medication, her pain was a six on a scale of one to ten. (*Id*.). The plaintiff testified that her pain reached a ten out of ten when she had run out of medication in the past. (*Id*.). The plaintiff's medication makes her drowsy. (Tr. 45). According to the plaintiff, she can sit comfortably in a straight-back chair or stand comfortably for forty-five minutes at most and can comfortably walk up to a block. (Tr. 41-42). The plaintiff indicated that her daughter helped her clean, and that meal preparation sometimes caused her difficulties. (Tr. 42-43). The plaintiff testified that her anxiety attacks occur "all of a sudden" and she feels "like I have to get out of where I'm at" and she feels as if she is unable to breathe well.  (Tr. 44).  The plaintiff stated that her panic attacks last about ten minutes and occur multiple times a day. (*Id*.).

The plaintiff also testified that her work experience was in the field of accounting. (Tr. 46). The plaintiff indicated she would work in a seated position and talk on the phone regularly. (Tr. 47). The plaintiff also indicated that she would sometimes have to lift 20 pounds. (Tr. 48).

### B. The Vocational Expert's (VE) Testimony

A vocational expert ("VE") testified at the hearing. (Tr. 55). The VE classified the plaintiff's past relevant work as an accounting clerk with a specific vocational preparation ("SVP")[4] level of 5. (Tr. 55-56). The ALJ posed three hypotheticals to the VE. The first hypothetical was:

> Assume a hypothetical individual of the claimant's age and education with the
> past job that you described. Further assume for this hypothetical, the individual

---

[4] SVP is defined in the Dictionary of Occupational Titles ("DOT") as "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." *See* Dictionary of Occupational Titles, Appendix C: Components of the Definition Trailer, § II (4th ed., rev. 1991).

could perform a range of light work, as defined by the DOT with the following limitations. This individual would require a sit/stand option and for that sit/stand option I would say it's at-will with no time off-task in the changing of positions. This individual could frequently climb ramps and stairs but should never climb ladders, ropes, or scaffolds. This individual could occasionally stoop, occasionally kneel, occasionally crawl, occasionally crouch, and frequently balance. This individual could frequently reach bilaterally and frequently handle and finger bilaterally, and is right-hand dominant. This individual should have no exposure to hazardous machinery or mechanical parts and no unprotected heights. No vibration. Would a person with these kinds of abilities be able to perform the claimant's past work?

(Tr. 56-57). In response to the ALJ's first hypothetical, the VE testified that for the hypothetical individual, "the position as accounting clerk would be suitable per the DOT, not as actually performed." (Tr. 57). The VE also stated that there would be transferable skills to other jobs within the light or sedentary levels of exertion with the same limitations as in the hypothetical. (*Id.*). These transferable skills include: computing; keeping financial records through classifying and recording numerical data; using computer accounting software; issuing, receiving, and recording checks; and general office duties like answering the phone and completing routine correspondence. (Tr. 57-58). The VE testified that other possible jobs for the plaintiff included: a cash accounting clerk; an invoice classification clerk; and an invoice control clerk. (Tr. 58).

The second hypothetical posed by the ALJ, built off the first one with the transferable skills. The sedentary level of exertion with the sit/stand option remained the same. The second hypothetical individual could maintain concentration for two hours at a time but might be off task 10% of the workday. (Tr. 58-59). The VE indicated that the DOT does not address off-task behavior, but, in the VE's experience, 10% would be the maximum allowed and the plaintiff's past work could be done, as well as the other jobs previously identified by the VE. (Tr. 59).

For the third hypothetical, the ALJ asked if the hypothetical "individual was able to complete simple, routine, and repetitive tasks, not at a production rate or pace, and could

frequently interact with co-workers, supervisors, and the public, would the past work per DOT still remain available?" (Tr. 59). The VE indicated that the plaintiff's past work or the other jobs identified by the VE for such a hypothetical individual would not remain available. (*Id.*).

The ALJ then returned to her first two hypotheticals and asked the VE if the hypothetical individual could still perform her past relevant work per the DOT or the other jobs identified by the VE, if the plaintiff could "only occasionally finger and handle with the dominant hand". (*Id.*). The VE responded that neither the past relevant work nor the other three jobs would be available under those conditions. (*Id.*).

## THE ALJ'S DECISION-MAKING PROCESS

"Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." (42 U.S.C. § 423(d)(1)(A)). The impairment(s) must be severe, making the plaintiff "unable to do his previous work . . . or any other kind of substantial gainful work which exists in the national economy . . . " (42 U.S.C. § 423(d)(2)(A)).

To determine whether the plaintiff is entitled to disability benefits, the ALJ must apply a five-step analysis. (20 C.F.R. § 404.1520(a)). The ALJ must first determine whether the plaintiff is engaging in substantial gainful activity ("SGA"). (20 C.F.R. § 404.1520(b)). If so, a finding of non-disability is made, and the inquiry ends. (*Id.*).

Second, the ALJ must determine whether the plaintiff suffers from a severe impairment or a combination of impairments. If the plaintiff does not, then a finding of non-disability is made, and the inquiry ends. (20 C.F.R. § 404.1520(c)).

16

Third, the ALJ compares the plaintiff's severe impairments to the impairments listed in Appendix I to Subpart 404 of the Code of Federal Regulations. (20 C.F.R. § 404.1520(d), Subpart P, Appendix I). If the impairment meets or equals a listed impairment, disability is presumed, and benefits are awarded. (20 C.F.R. § 404.1520(d)). If it does not, the analysis proceeds to the next step.

Fourth, the ALJ must determine whether the plaintiff has the residual functional capacity ("RFC") to perform his or her past relevant work. (20 CFR 404.1520(f)). RFC is defined as "the most [a claimant] can still do despite [his or her] limitations." (20 C.F.R. § 404.1545(a)(1)). This determination considers "all relevant evidence," including medical evidence, the claimant's own testimony and the observations of others. (*Id.*). If the plaintiff is unable to perform his or her past relevant work, then a prima facie case of disability is established and the burden of proof shifts to the Commissioner to show at step five that there is other work available in the national economy which the plaintiff can perform. (*Washington v. Comm'r of Soc. Sec.*, 906 F.3d 1353, 1359 (11th Cir. 2018); 20 C.F.R. § 404.1520(e)-(f)).

Fifth, the ALJ must determine whether the plaintiff can do any other work. The ALJ must consider the plaintiff's RFC, age, education, and work experience and determine if the plaintiff can make an adjustment to other work. (20 C.F.R. § 404.1520(a)(4)(6)(v)). If the plaintiff can make an adjustment to other work, the ALJ will find them not disabled. (*Id.*). If the claimant cannot make an adjustment to other work, the ALJ will find them disabled. (*Id.*).

## **THE ALJ'S FINDINGS**

At step one of the sequential evaluation process, the ALJ found that the plaintiff had not engaged in substantial gainful activity since the alleged onset date of disability.  (Tr. 17).  At step two, the ALJ found that the plaintiff had the severe impairments of: (1) degenerative disc

disease, status post back surgery; (2) carpal tunnel syndrome; (3) hyperlipidemia, (4) fibromyalgia, and (5) obesity. (*Id.*).  The ALJ also found that the plaintiff's mental impairments of depression, panic disorder, and anxiety, considered alone and in combination only caused a minimal limitation in the plaintiff's ability "to perform basic mental work activities" and were not severe. (Tr. 17-18).

At step three, the ALJ found that the plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526)." (Tr, 18-19).  When making these findings, the ALJ found that the mental impairments of the plaintiff caused a "mild" limitation in: understanding, remembering, or applying information; concentrating, persisting, or maintaining pace; interacting with others; and adapting or managing oneself.  (Tr. 19).  The ALJ then found that the plaintiff maintains

> [T]he residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except the claimant requires a sit and stand option at will with no time off tasks in the changing of positions. She can frequently climb ramps and stairs, and balance. The claimant could occasionally stoop, kneel, crawl, and crouch. She can never climb ladders, ropes or scaffolds. The claimant is right hand dominate. She can frequently reach, handle, and finger bilaterally. The claimant can never be exposed to hazardous machinery, mechanical parts, unprotected heights, and vibration. She can maintain concentration for at least two hours at a time; however, she may be off task not to exceed 10% of the day.

(Tr. 20).

At step four, the ALJ determined that the plaintiff was able to perform her past relevant work as an accounting clerk as it is generally performed in society (as defined in the DOT as a sedentary skilled job).  (Tr. 23).  The ALJ also determined that the plaintiff had transferable skills that included: "computing; classifying and recording numerical date (sic) to keep financial

records complete; using accounting software; receiving, recording, and issuing checks; and general office duties such as answering telephones and handling routine correspondence." (*Id.*).

At step five, the ALJ made an alternative finding that the plaintiff could perform other sedentary, semi-skilled and skilled jobs available in the national economy.  Those jobs include: a cash accounting clerk; an invoice classification clerk; and an invoice control clerk. (Tr. 24).

## STANDARD OF REVIEW

In reviewing claims brought under the Social Security Act, the Court must determine whether it is appropriate to grant either party's motion for summary judgment. Judicial review of the factual findings in disability cases is limited to determining whether the record contains substantial evidence to support the ALJ's findings and whether the correct legal standards were applied. (42 U.S.C.S. § 405(g) (2006); *see Wolfe v. Chater*, 86 F.3d 1072, 1076 (11th Cir. 1996) (holding that the reviewing court must not re-weigh evidence or substitute their discretion)). On judicial review, decisions made by the Commissioner of Social Security are conclusive if supported by substantial evidence and if the correct legal standard was applied. (42 U.S.C.S. § 405(g) (2006); *Kelley v. Apfel*, 185 F.3d 1211, 1213 (11th Cir. 1999)).

"Substantial evidence" is more than a scintilla, but less than a preponderance and is generally defined as such relevant evidence which a reasonable mind would accept as adequate to support a conclusion. (*See Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996)). In determining whether substantial evidence exists, "the court must view the record as a whole, taking into account evidence favorable as well as unfavorable to the decision." (*Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995)).

This standard of review applies to findings of fact, and no presumption of validity attaches to the Commissioner's legal conclusions, including whether the Commissioner applied

the proper standard in reviewing claims. (*See Cornellius v. Sullivan*, 936 F.3d 1143, 1145-46

(11th Cir. 1991) (finding the court must reverse where the Commissioner fails to apply the

correct law or fails to provide the reviewing court with sufficient reasoning for determining that

the Commissioner conducted proper legal analysis); *accord Martin v. Sullivan*, 894 F.2d 1520,

1529 (11th Cir. 1990)).

The reviewing court must be satisfied that the decision of the Commissioner is grounded

in the proper application of the appropriate legal standards. (*See Davis v. Shalala*, 985 F.2d 528,

531 (11th Cir. 1993)). The court may not, however, decide the facts anew, re-weigh evidence or

substitute its judgment for that of the ALJ, and even if the evidence weighs against the

Commissioner's decision the reviewing court must affirm if the decision is supported by

substantial evidence. (*See Miles*, 84 F.3d at 1400; *see also Baker v. Sullivan*, 880 F.2d 319, 321

(11th Cir. 1989)). Factual evidence is presumed valid, but the legal standard applied is not. (*See

Martin*, 894 F.2d at 1529). The Commissioner must apply the correct legal standard with

sufficient reasoning to avoid reversal. (*Id.*).

## LEGAL ANALYSIS

The plaintiff requests her motion for summary judgment be granted and the Court reverse

the Commissioner's decision that denied the plaintiff's application for disability benefits. (Pl.'s

Br. at 20). The plaintiff also requests a remand. (*Id.*). The plaintiff contends that: (1) the ALJ did

not properly evaluate the medical opinions; (2) the ALJ's assessment of the plaintiff's subjective

allegations is not properly supported, including the failure to properly assess fibromyalgia, the

right upper extremity impairments, and spinal impairments; and (3) the ALJ's findings do not

address if the plaintiff's mild mental impairments would prevent her from performing skilled and

semi-skilled work in finance. (*Id.* at 1, 15-17). For the reasons discussed below, the undersigned finds that this matter should be remanded.

## I.      The ALJ Did Not Properly Evaluate the Medical Source Opinions

The plaintiff asserts that the ALJ failed to properly evaluate medical source opinions because: (1) the ALJ incorrectly thought Dr. Dodds' orthopedic opinion was authored by psychiatrist Dr. Riveron, and accordingly, the ALJ gave insufficient support as to why the opinion was rejected; (2) the ALJ erred in crediting the opinion of non-examining physician Dr. Junejo asserting that Dr. Junejo's opinion was based on an incomplete record; and (3) that the ALJ failed to consider medical source statements pursuant to the factors at 20 C.F.R. § 404.1520(c)(1)&(3).[5] (Pl.'s Br. at 10). The defendant argues that the ALJ properly evaluated the medical source opinions in accordance with the Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844. (Def.'s Br. at 7-8).[6] The revised regulations alter how the agency considers medical opinions for claims filed on or after March 27, 2017. (*See* 20 C.F.R § 416.920(c) (2017) (no longer makes use of term "treating source"; instead uses phrase "medical source(s)").[7] Under the revisions, evidence is categorized into five categories: (1) objective medical evidence; (2) medical opinion[8]; (3) other medical evidence; (4) evidence from nonmedical sources; and (5) prior administrative medical findings. (20 C.F.R. § 404.1513(a)

---

[5] Both 20 C.F.R. § 1520(c) and 20 C.F.R. § 416.920(c) have been used in reference to the same regulation. Both statutes deal with consideration and articulation of medical opinions and prior administrative medical findings for claims filed on or after March 27, 2017. If one statute is cited, the other statute is still present and relevant.

[6] For claims filed before March 27, 2017, a treating physician's opinion is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence on the case record. *See* 20 C.F.R. § 404.1527(c)(2) (2017).

[7] For claims filed after March 27, 2017, the agency "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the plaintiff's own] medical sources . . . The most important factors we consider when we evaluate the persuasiveness of medical opinions and prior administrative medical findings are supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section)." *See* 20 C.F.R. § 416.920(c)(a) (2017).

[8] "A medical opinion is a statement from a medical source about what you can still do despite your impairments and whether you have one or more impairment-related limitations or restrictions in the following abilities . . . ." (20 C.F.R. § 404.1513(a)(2) (2017)).

(2017)).  Moreover, relationship with the claimant, while not the most important, is another

factor to take into consideration. (20 C.F.R. § 404.1520(c)(3)). This includes, length of the

treatment relationship, frequency of examinations, purpose of the treatment relationship, extent

of the treatment relationship, and examining relationship. (*Id.*). The ALJ must evaluate medical

evidence based on supportability, consistency, and relationship with the claimant. (*Id*). Under the

revision, "the Commissioner chose not to retain the 'treating source rule,' that could require

deference to treating source opinion evidence." (Def.'s Br. at 8). The revisions removed the term

"treating source," however, under the rules, consideration is still given to the relationship with

the claimant. (20 C.F.R. § 404.1520(c)(3)). Regarding the removal of the "treating source" term,

the Social Security Administration indicated that:

> [I]t is appropriate to remove the distinction between a "treating source"—who
> must be an AMS[9]—and the other medical sources from whom an individual may
> choose to receive evaluation, examination, or treatment. This will allow us to
> select an individual's own medical source, regardless of AMS status, to be a
> *preferred source* to conduct a consultive examination (CE) if the medical source
> meets our other requirements[.]

(Soc. Sec. Admin., *Revisions to Rules Regarding the Evaluation of Medical Evidence*, FEDERAL

REGISTER (Jan. 18, 2017), https://www.federalregister.gov/d/2017-00455/p-90 (emphasis

added)). The defendant notes that the ALJ did not explain how she considered the various

physicians' and specialists' relationship with the claimant, arguing that the rules do not require

an explanation in these circumstances. (Def.'s Br. at 8-9).[10] However, even if an explanation is

---

[9] AMS stands for "acceptable medical source." (Soc. Sec. Admin., *Revisions to Rules Regarding the Evaluation of Medical Evidence*, FEDERAL REGISTER (Jan. 18, 2017), https://www.federalregister.gov/documents/2017/01/18/2017-00455/revisions-to-rules-regarding-the-evaluation-of-medical-evidence).

[10] The defendant cites to *Barnhart v. Walton*, 535 U.S. 212, 217-25 (2002) (deferring to the Commissioner's "considerable authority" to interpret the Act); *Schisler v. Sullivan*, 3 F.3d 563, 568-69 (2d Cir. 1993) ("[n]ew regulations at variance with prior judicial precedents are upheld unless 'they exceed[] the [Commissioner]'s authority [or] are arbitrary and capricious.'" (quoting *Campbell*, 461 U.S. at 466)); *Stroup v. Apfel*, No. 96-1722, 2000 WL 216620, at *5 (4th Cir. Feb. 24, 2000) ("The 1991 regulations supersede the 'treating physician rule' from our prior case law.").

not required, the ALJ's findings must be supported by substantial evidence. *Kelley v. Apfel*, 185 F.3d 1211, 1213 (11th Cir. 1999).

The ALJ must explain how persuasive a medical opinion(s) and/or a prior administrative medical finding(s) is through supportability and consistency. (20 C.F.R. § 416.920c(b)(2) (2017))*.* The ALJ is not required to explain how the other remaining factors were considered unless the ALJ finds that two or more medical opinions or prior administrative medical findings about the same issue are both equally well-supported and consistent with the record but not identical. (20 C.F.R. § 416.920c(b)(3) (2017)). Additionally, the adjudicator is not required to articulate the consideration of each opinion or finding of one medical source individually due to the voluminous amounts of case records. (20 C.F.R. § 416.920c(b)(1) (2017)).

### A.     The Confusion of Dr. Riveron with Dr. Dodds

This matter should be remanded due to the confusion by the ALJ between the opinion written by Dr. Riveron and the opinion written by Dr. Dodds.  The ALJ indicated that she was not persuaded by the opinion of psychiatrist, Dr. Riveron.  (Tr. 19).  The ALJ noted internal inconsistencies.  (*Id*).  The ALJ found

> the manipulative limitations opined by Dr. Riveron to be unpersuasive (Ex. 14F). The doctor did not provide objective findings to support this opinion. Second, this opinion is not consistent with the record. For example, the claimant reported 80-85% improvement in her left hand symptoms after she had left carpal tunnel release four years prior (Ex. 17F at 1).

 (Tr. 22).

Dr. Riveron, however, did not make manipulative limitation findings.  As noted by the plaintiff, the manipulative limitations referenced by the ALJ in Exhibit 14F were contained on page 1221 of the record.  Page 1221 of the record is an opinion authored by Dr. Dodds, an orthopedist, not

Dr. Riveron, a psychiatrist.  The opinion of Dr. Riveron is found on pages 1222-25 of the record and does not contain any manipulative limitation findings.

The defendant asserts that the incorrect reference to Dr. Riveron instead of Dr. Dodds is a "harmless scrivener's error" because the ALJ referenced Dr. Riveron before as the plaintiff's psychiatrist. (Def.'s Br. at 12 (citing Tr. 19)). The undersigned disagrees. The ALJ's reference to Dr. Riveron does not refer to him as the plaintiff's psychiatrist. (*See* Tr. 19). Moreover, when the ALJ found Dr. Riveron's findings inconsistent with the record (see quote above to Tr. 22), it was a mistake, because the ALJ was referring to the manipulative limitations noted by Dr. Dodds on p. 1221 of the record.  The ALJ was not referencing something written by Dr. Riveron.

The defendant notes that the opinion by Dr. Dodds on Tr. 1221 "included more restrictive manipulative limitations than the ALJ included in the RFC . . ." but the defendant still contends that those findings are unpersuasive because they were not accompanied by objective findings and were inconsistent with the record. (Def.'s Br. at 10-11). The defendant mistakenly states, however, that "Dr. Dodds completed a checklist-type form, citing no objective evidence to support the manipulative limitations he included[.]" (*Id.*). There is no "checklist" authored by Dr. Dodds. (*See* Tr. 1221). There is a checklist contained in Dr. Riveron's opinion at Tr. 1222-23. Dr. Dodds did include evidence of the plaintiff's symptoms contributing to his opinion. Examples include, "the active right carpal tunnel syndrome" and "bilateral carpal tunnel syndrome status post release" (*See* Tr. 1221).  The ALJ confused Dr. Dodds with Dr. Riveron, and this matter should be remanded for further proceedings that properly consider the opinions of both Dr. Dodds and Dr. Riveron.

### B.        Dr. Juenjo and the Fibromyalgia Diagnosis

The plaintiff further asserts that the ALJ erred in crediting the opinion of non-examining

physician Dr. Junejo, because the opinion was based on an incomplete record, and the analysis

was insufficient. (Pl.'s Br. at 14). The plaintiff notes that on May 2, 2018, Dr. Junejo reviewed

certain records dated September 2017 through April 2018. (*Id.*). According to the plaintiff, "Dr.

Juenjo noted no medical opinion from any source that was in the record and concluded, '[b]ased

on objective medical evidence claimant is capable of this RFC.'" (*Id,* quoting Tr. 83). The

plaintiff asserts that Dr. Junejo's reliance on "objective medical evidence" to assess fibromyalgia

was incorrect, because the "hallmark" of a fibromyalgia diagnosis is actually the lack of

objective medical evidence. (*Id.*; *see Somogy v. Comm'r of Soc. Sec.*, 366 F.App'x 56, 63-64

(11th Cir. 2010)). Individuals diagnosed with fibromyalgia generally have normal exam results.

(*See Francis v. Saul*, 2020 U.S. Dist. Lexis 43460, at *8 (M.D. Fla. March 13, 2020)). In the

*Somogy* case, the court noted that:

> We, along with several other courts, have recognized that fibromyalgia "often
> lacks medical or laboratory signs, and is generally diagnosed mostly on an
> individual's described symptoms," and that the "hallmark" of fibromyalgia is
> therefore "a lack of objective evidence." *Moore v. Barnhart,* 405 F.3d 1208, 1211
> (11th Cir.2005) (per curiam); *see also Rogers v. Comm'r of Social Sec.,* 486 F.3d
> 234, 243 (6th Cir.2007) (stating that "fibromyalgia patients present no objectively
> alarming signs"); *Green–Younger v. Barnhart,* 335 F.3d 99, 108 (2d Cir.2003)
> (explaining that "there are no objective tests which can conclusively confirm
> [fibromyalgia]" (quotation marks and citation omitted)); *Sarchet v. Chater,* 78
> F.3d 305, 306 (7th Cir.1996) (noting that "[t]here are no laboratory tests for the
> presence or severity of fibromyalgia"). The lack of objective clinical findings is,
> at least in the case of fibromyalgia, therefore insufficient alone to support an
> ALJ's rejection of a treating physician's opinion as to the claimant's functional
> limitations. *See Green–Younger,* 335 F.3d at 105–08 (holding that because
> fibromyalgia is "a disease that eludes [objective] measurement," ALJ improperly
> discredited treating physician's disability determination based upon lack of
> objective evidence).

(Pl.'s Br. at 14, 16; *Somogy v. Comm'r of Soc. Sec.*, 366 F.App'x 56, 63-64 (11th Cir. 2010)).

The Defendant does not dispute that Dr. Junejo's opinion relies on an incomplete record or that Dr. Junejo incorrectly relied solely on objective evidence. (*See* Def.'s Br. at 14-16). Instead, the Defendant attempts to dismiss the argument stating "though, the ALJ did not rely on objective findings . . ." and that even "[i]f not relevant to her fibromyalgia, plaintiff had other physical impairments where objective evidence was relevant [to Dr. Juenjo's findings]  .. ." (Def.'s Br. at 16).

The ALJ determined that the plaintiff's fibromyalgia was a severe impairment. (Tr. 17). The plaintiff asserts, however, that the ALJ did not adequately indicate how the plaintiff's fibromyalgia was considered. The plaintiff further notes that that there is no discussion in the ALJ's decision related to fibromyalgia other than the mention of Dr. Rivas Chacon's exam and finding of 16 of 18 tender points. The defendant does little to respond to the plaintiff's assertions and indicates that the plaintiff "does not point to evidence . . . that would support a finding that her fibromyalgia was disabling or restricted her further than the RFC assessed by the ALJ." (Def.'s Br. at 15). However, the plaintiff is only required to demonstrate that the ALJ's findings are not supported by substantial evidence and that incorrect legal standards were applied. (42 U.S.C.S. § 405(g) (2006); *see Wolfe v. Chater*, 86 F.3d 1072, 1076 (11th Cir. 1996)).

The ALJ credited the opinion of Dr. Junejo in her ruling.  Dr. Junejo's opinion was based on objective medical evidence.  This was an error, because the "hallmark" of fibromyalgia is the "lack of objective evidence." *Moore v. Barnhart,* 405 F.3d 1208, 1211 (11th Cir.2005) (per curiam).  The ALJ's reliance on the opinion of Dr. Junejo was not supported by substantial evidence. This matter should be remanded for proper consideration.

## II.    The ALJ Properly Evaluated the Plaintiff's Subjective Symptoms of Her Right Upper Extremity and Spinal Impairments

The plaintiff asserts that the ALJ did not sufficiently assess the plaintiff's subjective symptoms, including right upper extremity impairments and spinal impairments. (Pl. Br. at 15). The plaintiff further asserts that disregard of subjective pain testimony must be based on substantial evidence. (*See Jones v. Dept. of Health and Human Services*, 941 F.2d 1529, 1532 (11th Cir. 1991)).  The plaintiff also asserts that to demonstrate disability based on the testimony of pain and other symptoms a plaintiff must show: (1) evidence of an underlying medical condition; and either (a) objective medical evidence supporting the severity of the claimed pain; or (b) that the objective medical ailment can reasonably be expected to result in the alleged pain. (*See Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991)).  The ALJ found that the plaintiff's "medically determinable impairments could be reasonably expected to cause the Plaintiff's testified symptoms", but the plaintiff's statements regarding the intensity, persistence, and limiting effects of the symptoms were not completely consistent with the record. (Pl.'s Br. at 15; Tr. 20).

The defendant asserts that "symptom assessments are the province of the ALJ— not the Court." *See Moore v. Barnhart*, 405 F.3d 1208, 1212 (11th Cir. 2005) (per curium). When evaluating the plaintiff's statements regarding the intensity, persistence, or limiting effects of her symptoms, the ALJ considers all the evidence, "*objective and subjective*." (Emphasis in the original). (Def.'s Br. at 14-15 (citing 20 C.F.R. § 404.1529)).

### A.    Right Upper Extremity Impairments

The plaintiff asserts that ALJ did not clearly address why the plaintiff's right upper extremity impairments and manipulative limitations were discredited and why the plaintiff was found capable of frequently using her right upper extremity. (Pl.'s Br. at 16). The plaintiff notes that the ALJ discussed the plaintiff's August 2019 nerve conduction study that was followed by right carpal tunnel release, and that the plaintiff had relief after left carpal tunnel surgery before the alleged onset date. However, the plaintiff notes that the plaintiff's right upper extremity was the area in question during the relevant time period, that surgery was not conducted until August 2019, and post-surgical limitations continued. (Tr. 1221, 1234, 1238). The plaintiff asserts that, despite contrary evidence, the ALJ's decision does not explain how the ALJ concluded that the plaintiff had the RFC to frequently use her right upper extremity to reach, handle, and finger. (Pl. Br. at 17).

The defendant addresses the plaintiff's assertions by arguing that the ALJ adequately explained why she did not adopt Dr. Dodds' manipulative limitations.  The defendant further asserts that the fact that the plaintiff "received treatment related to her right upper extremity symptoms is not dispositive of the need to include any particular limitation in the RFC." (Def.'s Br. at 16).  The undersigned agrees.  "[S]ymptom assessments are the province of the ALJ—not the Court."  *Moore* at 1212. When evaluating the plaintiff's statements regarding the intensity, persistence, or limiting effects of her symptoms, the ALJ considers all the evidence, "*objective and subjective*." (Emphasis in the original). (Def.'s Br. at 14-15 (citing 20 C.F.R. § 404.1529)). With respect to the ALJ's evaluation of the right upper extremity impairments, the ALJ clearly

indicated why she did not agree with the manipulative limitations found in the record.  It is not

for the Court to assess the plaintiff's symptoms in that regard.

The ALJ indicated in her opinion that there were no objective findings in the record to

support the plaintiff's manipulative limitations.  (Tr. 22)  The defendant asserts that the ALJ

properly determined that the restrictive limitations on the plaintiff's right upper extremity found

in the record were not supported by objective findings and were not consistent with the record.

The plaintiff asserts that there are several treatment notes in the record that demonstrate the

plaintiff's manipulative limitations.  In *Mitchell v. Comm'r of Soc. Sec.*, the Eleventh Circuit

found that

> contrary to Mitchell's contention that the ALJ ignored
> evidence favorable to Mitchell, 'there is no rigid requirement
> that the ALJ specifically refer to every piece of evidence in
> his decision, so long as the ALJ's decision ... is not a broad
> rejection which is not enough to enable [a reviewing court] to
> conclude that the ALJ considered [the claimant's] medical
> condition as a whole.'…. The ALJ's decision in this case was
> not a broad rejection and was sufficient to enable the district
> court and this Court to conclude the ALJ considered
> Mitchell's medical condition as a whole.

*Mitchell v. Comm'r of Soc. Sec.*, 771 F.3d 780, 782 (11th Cir. 2014).

In *Martin v. Sullivan,* the Eleventh Circuit noted that "[e]ven if the evidence

preponderates against the Secretary's factual findings, we must affirm if the decision reached is

supported by substantial evidence".  *Martin v. Sullivan,* 894 F.2d 1520, 1529 (11th Cir. 1990).

The fact that some evidence may contradict an ALJ's finding is not grounds for remand.  *See*

*Moore v.* Barnhart, 405 F.3d 1208, 1213 (11th Cir. 2005) ("To the extent that Moore points to

other evidence which would undermine the ALJ's RFC determination, her contentions

misinterpret the narrowly circumscribed nature of our appellate review, which precludes us from

're-weigh[ing] the evidence or substitut[ing] our judgment for that [of the Commissioner] ... even if the evidence preponderates against' the decision." Additionally, if an ALJ's opinion is supported by substantial evidence, a district court must affirm the ALJ's decision. *Id.*

Moreover, at the ALJ hearing, the VE was given a hypothetical that mirrored the limitations that were eventually included in the RFC. The ALJ based her finding at Step Four of the sequential evaluation process that the plaintiff could perform her past relevant work, partially on that VE testimony. (Tr. 20, 23-24, 55-59). In the Eleventh Circuit case of *Jones v. Apfel*, the Court held that the testimony of a VE is crucial, and due to the significance of such testimony, an ALJ may rely solely on the VE's testimony. *Jones v. Apfel*, 190 F.3d 1224, 1230 (11th Cir. 1999).

The ALJ's opinion cited to substantial evidence in the record that supported her opinion. For example, the ALJ noted in her opinion that on August 16, 2018, the plaintiff had full range of motion, sensation, and strength of her extremities. (Tr. 21). Furthermore, on September 12, 2018, the plaintiff had a normal range of motion and strength of her extremities, and normal motor function. (Tr. 22). Accordingly, the ALJ's findings regarding the right upper extremity and manipulative limitations were supported by substantial evidence. Accordingly, the ALJ's decision should be upheld with respect to the right upper extremity impairments.

### B.    Spinal Impairments

The plaintiff asserts that the ALJ improperly discredited the plaintiff's multiple spinal abnormality assertions, noting that the ALJ should have explained and considered the significance of the plaintiff's back and spinal treatments. (Pl.'s Br. at 17). Although the ALJ's opinion cited the plaintiff's August 2017 hospital admission for back pain, the plaintiff's MRI in September 2019 was positive for cervical spinal ailments with a "small, herniated disc protrusion" as well as "severe left neural foraminal stenosis, large disc bulge, canal stenosis, and

mild disc bulge." (Tr. 1229-30). However, the ALJ opined that the plaintiff's asserted symptoms, that include drowsiness from pain medication and pain throughout her body especially her back making it difficult to walk and sit, were "unsupported." (*Id*.).

The defendant responds to the plaintiff's assertions by stating that "pointing to some evidence that contradicts the ALJ's decision is not enough to obtain a remand under the substantial evidence standard of review" (Def.'s Br. at 17, citing *Mitchell v. Comm'r of Soc. Sec.*, 771 F.3d 780, 782 (11th Cir. 2014)). The undersigned agrees, that under *Mitchell*, the existence of some evidence that may contradict the decision of the ALJ does not warrant remand under the substantial evidence standard of review.

Additionally, the ALJ's findings with respect to the plaintiff's spinal impairments are well supported by substantial evidence from the record.  The ALJ cited to many instances in the record that support her findings.  Some of those examples cited by the ALJ include that: (1) on August 23, 2017, the plaintiff underwent revision of her lumbar laminectomy and resection of disk herniation, rehabilitation was recommended but the plaintiff declined, and was discharged on August 30, 2017(Tr. 21); (2) the plaintiff was admitted to the hospital due to back pain on September 2, 2017, the plaintiff's symptoms were controlled with intravenous and oral narcotics, and on the day of discharge the plaintiff was seen by physical therapy, was found not to have any acute needs for home therapy, and ambulated well (*Id*.); (3)  X-rays of the plaintiff's lumbar spine on October 27, 2017, showed posterior fusion at L4-S1 with no evidence of hardware malfunction or malalignment (*Id*.); and (4) on August 16, 2018, the plaintiff had had tenderness on examination of her back, but she had full range of motion (*Id*.)  Accordingly, the ALJ's findings are supported by substantial evidence and her opinion should be upheld with respect to the spinal impairments.

**III.    The ALJ Properly Considered the Plaintiff's Mild Mental Impairments in Determining the Plaintiff's Capability of Performing Skilled and Semi-Skilled Work in Finance**

The ALJ found, and the plaintiff agrees, that the plaintiff had medically determinable mental impairments that cause "minimal limitation" on the plaintiff's ability to perform *basic* work activity, and are thus, non-severe. (Tr. 18; Pl.'s Br. at 18). The plaintiff asserts, however, that the ALJ erred by failing to explain how the plaintiff could perform *skilled* and *semi-skilled* work despite the findings of mild mental limitations. (Pl.'s Br. at 18). In support of this assertion, the plaintiff cites to *Harrison v. Berryhill*, where the court ordered "on remand, the ALJ should also review the RFC to include any non-severe mental impairments that could affect the plaintiff's ability to perform skilled past relevant work." *Harrison v. Berryhill*, No. 16-CV-81492, 2018 U.S. Dist. LEXIS 23489, at *16 n.4 (S.D. Fla., Feb. 12, 2018). Moreover, the *Harrison* court reasoned that:

> Case law requires that the RFC and hypotheticals posed to the Vocational Expert include all of plaintiff's medically supported impairments, both severe and *non-severe*. *Sanchez v. Comm'r of Soc. Sec.*, 507 F. App'x 855, 858 (11th Cir. 2013) (affirming that, in assessing claimant's RFC, the ALJ must consider all medically determinable impairments, including those that are not severe); *Bunch v. Colvin*, No. 8:15-CV-1727-T-DNF, 2017 U.S. Dist. LEXIS 24490, 2017 WL 695257, at *4 (M.D. Fla. Feb. 22, 2017) ("Even if the ALJ found that plaintiff's alleged mental impairments were non-severe at step two, he was still required to consider these impairments in determining plaintiff's RFC"); *Eubanks-Glades v. Colvin*, No. 13- 60029-CIV, 2013 U.S. Dist. LEXIS 165838, 2013 WL 12104893, at *12-13 (S.D. Fla. Nov. 5, 2013) (referencing SSR 96-8p, 1996 SSR LEXIS 5 which requires that the Step 4 RFC analysis include limitations and restrictions imposed by all of an individual's impairments, even those that are not severe) (internal quotations and citations omitted).

(Pl.'s Br. at 19-20 (citing *Harrison*, 2018 U.S. Dist. LEXIS 23489, at *16 n.4 (emphasis original))). The plaintiff also cites to 20 C.F.R. § 404.1545(a)(2), in support of her assertion, which states "we will consider all of your medically determinable impairments of which we are

aware, including your medically determinable impairments that are not "severe," . . . when we assess your residual functional capacity." Additionally, § 404.1545(a)(4) requires consideration of "ability to meet the physical, mental, sensory, and other requirements of work . . . ."

The defendant asserts that the ALJ found that the mental impairments caused "mild limitations" not "mild functional limitations" with respect to the "paragraph B"[11] criteria used by the ALJ. (Def.'s Br. at 17). Accordingly, the defendant asserts that the "paragraph B" criteria had no impact on the RFC assessment and notes the ALJ's previous assertion that limitations found in a "paragraph B" assessment are not a residual functional capacity analysis but are used to determine the *severity* of mental impairments. (Def.'s Br. at 18 (citing Tr. 19)). In rebuttal, the plaintiff asserts that these are "functional" determinations because, as noted by the ALJ, the "paragraph B" criteria require an analysis of "functional areas." (Pl.'s Re. at 8).

The defendant further asserts that the ALJ did discuss the findings of the "consultative psychologist and the opinion of Dr. Riveron . . . in support of her finding that the plaintiff's impairments were non-severe." (Def.'s Br. at 19). The defendant also asserts that the Court should read the ALJ decision as a "whole," that the ALJ made an "RFC assessment based on all of the relevant evidence," and that the ALJ does not have to include findings of non-severe mental impairments in the hypothetical posed to the vocational expert. (Def.'s Br. at 19-20 (citing *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997); 20 C.F.R. § 404.1545(b)-(d); *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1161 (11th Cir. 2004)). Moreover, under

---

[11] The four areas of mental functioning outlined in the Listing of Impairments (20 CFR, Part 404, Subpart P, Appendix 1), known as the "paragraph B" criteria are: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing oneself.

*Crawford*, "the ALJ was not required to include findings in the hypothetical that the ALJ had properly rejected as unsupported." *Crawford*, 363 F.3d at 1161.

The Court finds that when reading the ALJ's decision as a "whole," that the ALJ made an "RFC assessment based on all of the relevant evidence," and that the ALJ does not have to include findings of non-severe mental impairments in the hypothetical posed to the vocational expert. *See Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997); 20 C.F.R. § 404.1545(b)-(d); *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1161 (11th Cir. 2004)). The undersigned also notes that under *Crawford*, the ALJ need not "include findings in the hypothetical that the ALJ had properly rejected as unsupported." *Crawford*, 363 F.3d at 1161.

Additionally, the undersigned notes that the ALJ's opinion cites to many instances that demonstrate she properly considered the plaintiff's mild mental impairments in determining the plaintiff's ability to perform skilled and semi-skilled work in finance, and that demonstrate that the ALJ's opinion is supported by substantial evidence. Examples include: (1) on August 6, 2017, the plaintiff was oriented times three, had good judgment and insight, an appropriate mood and affect, and was cooperative (Tr. 21); (2) on April 9, 2018, the plaintiff's memory was normal, she was oriented times four, and had an appropriate mood and affect (*Id.*); and (3) on August 6, 2018, the plaintiff was alert and oriented times four, her speech was normal, and she was cooperative with an appropriate mood and affect (*Id.*). Accordingly, the undersigned finds that the ALJ properly considered the plaintiff's mild mental impairments, the ALJ's opinion is supported by substantial evidence, and the opinion of the ALJ should be upheld on the issue.

## **CONCLUSION**

In accordance with the foregoing Report and Recommendation, the undersigned respectfully recommends that the plaintiff's Motion for Summary Judgment (DE # 27, 3/2/2021)

be **GRANTED as described above**, the Defendant's Motion for Summary Judgment (DE # 28, 3/31/2021) be **DENIED** and this matter be **REMANDED** in accordance with the above Report and Recommendation.

**RECOMMENDATION**

In accordance with the foregoing Report and Recommendation, it is **RESPECTFULLY RECOMMENDED** that the plaintiff's Motion for Summary Judgment (DE # 27, 3/2/2021) be **GRANTED**, the Defendant's Motion for Summary Judgment (DE # 28, 3/31/2021) be **DENIED**, and this matter be **REMANDED** for further proceedings consistent with this Report and Recommendation.

The parties have fourteen (14) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with the Honorable Robert N. Scola. Failure to file objections timely shall bar the parties from a de novo determination by the District Judge of an issue covered in the report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report, except on the grounds of plain error, if necessary and in the interest of justice. *See* 28 U.S.C. § 636(b)(1); *Harrigan v. Metro Dade Police Dep't. Station #4*, 977 F.3d 1185, 1191-92 (11th Cir. 2020); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Jonson*, 885 F.2d 790, 794 (1989); 11th Cir. R. 3-1 (2019).

RESPECTFULLY SUBMITTED at the United States Courthouse, Miami, Florida this 13th day of December 2021.

JOHN J. O'SULLIVAN
CHIEF UNITED STATES MAGISTRATE JUDGE